John Henry HEAD et al., Plaintiffs-Appellants,

v.

TIMKEN ROLLER BEARING COMPANY et al., Defendants-Appellees.

No. 72–1994.

United States Court of Appeals, Sixth Circuit.

Argued April 4, 1973.

Decided Oct. 12, 1973.

---

William D. Wells, New York City, for appellants; Irwin W. Barkan, Barkan, Barkan & Neff, Columbus, Ohio, on brief.

Nancy E. Stanley, Washington, D. C., for United States, amicus curiae; William A. Carey, Gen. Counsel, Julia P. Cooper, Associate Gen. Counsel (Acting), Beatrice Rosenberg, Joseph T. Eddins, Attys., E.E.O.C., Washington, D. C., on brief; Howard Besser, E.E.O.C., Cleveland, Ohio, of counsel.

Lawrence D. Stanley, Columbus, Ohio, for appellees; David M. Selcer, Porter, Stanley, Platt & Arthur, Columbus, Ohio, John G. Ketterer, John F. Buchman, Day, Ketterer, Raley, Wright & Rybolt, Canton, Ohio, on brief; Clayman, Jaffy & Taylor, Columbus, Ohio, of counsel.

Before WEICK, MILLER and KENT,* Circuit Judges.

WILLIAM E. MILLER, Circuit Judge.

This is an appeal by the plaintiffs from an order by the district court in a civil rights case finding unlawful employment discrimination but denying relief. Thirteen named plaintiffs, twelve

* Judge W. Wallace Kent died May 28, 1973.

blacks and one white, all employees of Timken Roller Bearing Company (herein the Timken Company or Timken) brought this class action on behalf of themselves and all similarly situated employees in the Columbus, Ohio, plant of Timken. The complaint alleged racial discrimination by Timken and the labor union representing Timken's employees at the Columbus plant, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.

The gravamen of the complaint is that Timken and the labor union had agreed on a system of seniority and transfer that effectively denied blacks the opportunity to obtain many jobs that prior to the effective date of the Civil Rights Act of 1964, had been assigned almost exclusively to whites. The suit was dismissed as to the labor union and no appeal is taken from such dismissal.

The court below divided the consideration of the case into two time periods, pre-1968 and post-1968. The significance of the demarcation is that in 1968 the Timken Company changed from a departmental seniority transfer system to a plant-wide seniority transfer system. Some limited bid occupations were exempt from the plant-wide system.[1] The entire pre-1968 system and the limited bid provision of the post-1968 system were challenged as discriminatory by the plaintiffs. The plaintiffs also moved at the close of their evidence to amend their complaint to allege an additional cause of action under the Civil Rights Act of 1866, 42 U.S.C. § 1981, specifically to obtain the benefit of al-

leged racially discriminatory activities by the company prior to the effective date of Title VII (July 2, 1965).

The court below denied the motion of the plaintiffs to amend their pleadings. It also declined to grant any relief to the plaintiffs despite its holding that Timken had violated the Civil Rights Act of 1964. The court thus refused to enter an injunction against Timken, or to award back pay or reasonable attorney's fees as prayed for. From that decision the plaintiffs have appealed.

Four issues are presented: (1) Whether the court below erred in denying the plaintiffs' motion for leave to amend; (2) Whether the court below erred in not awarding back pay to the plaintiffs despite its holding that prior to 1968 Timken had violated Title VII; (3) Whether the court erred in not enjoining Timken's limited bid system; and (4) Whether the court abused its discretion in not awarding reasonable attorney's fees to the plaintiffs.

Under Rule 15(b) of the Federal Rules of Civil Procedure,[2] the federal courts are obligated freely to allow amendments to the pleadings. If the amendment is not timely the court must weigh the cause shown for the delay against the resulting prejudice to the opposing party. In Nevels v. Ford Motor Co., 439 F.2d 251, 257 (5th Cir.1971), the court said:

> While it is generally true that leave to file amendments should be freely given, Fed.R.Civ.P. 15(a), amendments should be tendered no later

---

1. A more detailed description of the seniority systems is set forth at appropriate points in this opinion.

2. *(b) Amendments to Conform to the Evidence.* When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure

so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

than the time of pretrial, unless compelling reasons why this could not have been done are presented. . . . [A trial judge's] decision must weigh good cause shown for the delay in moving, vis a vis dilatoriness of counsel resulting in last minute surprise and inability of opposing counsel to meet the tendered issue. See Albee Homes, Inc. v. Lutman, 3 Cir. 1969, 406 F.2d 11, 14; Inland Container Corp. v. Atlantic Coast Line R.R., 5 Cir. 1959, 266 F.2d 857, 861, 3 J. Moore, Federal Practice §§ 15.-08(4), 16.12 (2d ed. 1968).

Rule 15(b) is not a *carte blanche,* allowing parties to amend their pleadings at any time. Proper analysis is, as stated, to weigh the cause shown for the delay against the resulting prejudice to the opposing party.

Admittedly, the district court did find pre-1965 discrimination and the plaintiffs insist, therefore, that the issue whether the company discriminated in the past was actually litigated in the case. This argument presents two problems germane to appropriateness of the denial of leave to amend. First, there was more presented by the proposed amendment than an issue of pre-1965

discrimination. The issue of whether the defendants were liable under § 1981,[3] even granting discrimination, would also have to be litigated. Secondly, the prejudice to Timken, if any, and what it would have to prove in order to defeat the claim would also have to be considered. The plaintiffs would not have a significantly heavier burden but Timken would indeed be required to offer evidence much different from that which it would be expected to offer against the plaintiffs' other claims.

■ Was there good cause for the delay and if so, how does it weigh against the factors already noted? The plaintiffs insist that the discovery of "new" law justified the delay. This so-called new law was the case of Brown v. Gaston County Dyeing Machine Co., 457 F. 2d 1377 (4th Cir. 1972). The plaintiffs' view is that this case was a novel decision articulating a new theory of damages. *Brown* perhaps is the first case actually to hold that pre-Title VII acts of racial discrimination in employment may be remedied by back pay under § 1981. However, even the members of the court deciding *Brown* were in disagreement as to the novelty of the decision.[4] We find it unnecessary, how-

3. Civil Rights Act of 1866, 42 U.S.C. § 1981. The statute provides:

All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens. . . .

4. Judge Butzner, speaking for the majority in *Brown,* obviously did not consider this theory novel when he said:

The district judge's findings establish that the company violated 42 U.S.C. § 1981 by denying Brown a welding job because of his race from the time he applied in 1960 until he was employed as a welder-trainee in 1961. Brown, therefore, is entitled to back pay measured by the difference between the wages he would have earned had he been initially employed as a welder-trainee and his actual wages. Boudreaux v. Baton Rouge Marine Contracting Co., 437 F.2d 1011 (5th Cir. 1971); Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970), cert. denied, 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.

2d 231 (1971); Waters v. Wisconsin Steel Works, 427 F.2d 476 (7th Cir.), cert. denied, United Order of Am. Bricklayers and Stone Masons, Local 21 v. Waters, 400 U. S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970).

Judge Dupree, dissenting, considered the awarding of back pay under § 1981 for pre-Title VII discrimination as novel when he said:

Cited by the majority in support of the back pay award in this case are two cases from the Fifth Circuit and one from the Seventh. These cases hold that Section 1981 affords a right to sue for "private" racial discrimination in employment and that this right was not repealed by the enactment of Title VII of the Civil Rights Act of 1964. Other courts have reached the same conclusion. None of these cases involved an award of back pay for a violation of Section 1981 which occurred prior to Title VII, however, and diligent research has failed to unearth such a case. Since Section 1981 for the first one hundred years of its existence was construed to apply only to state action and not to

ever, to venture an opinion on this topic. Whether *Brown* was the first case to award back pay for pre-Title VII racial discrimination in employment is largely irrelevant. The plaintiffs cite in their brief numerous cases for the proposition "that § 1981's applicability extends to private acts of racial discrimination in employment and that it is concurrent with and independent of Title VII's applicability." These authorities,[5] (Caldwell v. National Brewing Co., 443 F.2d 1044 (5th Cir. 1971), cert. den. 405 U.S. 916, 92 S.Ct. 931, 30 L.Ed.2d 785 (1972), being the leading case) do establish § 1981 as a separate and concurrent cause of action with Title VII. The court in *Caldwell* held that a person may purposely avoid filing with the Equal Employment Opportunity Commission and seek an independent remedy for employment discrimination under § 1981. These decisions make it apparent that back pay for pre-Title VII racially discriminatory acts in employment was potentially available under § 1981[6] before

affect dealings between private individuals, this paucity of precedent is readily understandable. [Footnote omitted.] 457 F.2d at 1384–1385.

5. Caldwell v. National Brewing Co., 443 F.2d 1044 (5th Cir. 1971) cert. den. 405 U.S. 916, 92 S.Ct. 931, 30 L.Ed.2d 785 (1972) ; Young v. I. T. T., 438 F.2d 757 (3rd Cir. 1971) ; Boudreaux v. Baton Rouge Marine Contracting Co., 437 F.2d 1011 (5th Cir. 1970) ; Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970) ; Waters v. Wisconsin Steel Works, 427 F.2d 476 (7th Cir. 1970).

6. Although this Court has never expressly held that this type of relief is available under § 1981, nor do we intend to do so in this opinion, we have in Johnson v. City of Cincinnati, 450 F.2d 796 (6th Cir. 1971), favorably cited the authorities referred to in the plaintiffs' brief. (see n. 5 *supra*.) In holding that 42 U.S.C. § 1982 was not superseded by the Fair Housing provisions of the Civil Rights Act of 1968, 42 U.S.C. § 3601, we referred to these § 1981 precedents as analogous. It is therefore not an unreasonable or illogical position to argue that the analysis in *Johnson* supports an adoption of the co-existence theory of Title VII and § 1981.

the *Brown* decision. We find therefore that there was no just cause for delay and that the district court's denial of the motion for leave to amend the pleadings was not an abuse of its discretion.

Did the district court err in not awarding back pay to the plaintiffs despite its holding that prior to 1968 Timken had violated Title VII? On this issue we are concerned only with a time period beginning July 2, 1965, the effective date of Title VII, and ending November 4, 1968, the termination date of Timken's unit or departmental seniority system.

The district court held that prior to the effective date of the Civil Rights Act of 1964, Timken hired along racial lines and that this coupled with the pre-1968 unit or departmental seniority system [7] constituted a policy of racial assignment that denied black employees equal opportunity. We agree with this holding. We also agree with the district court's holding that the

7. The unit or departmental seniority system and its effects were described by the district court:

Between 1965 and 1968, pursuant to the 1965 Basic Labor Agreement entered into between the defendant Union and the Company, the plant operated under a unit, or departmental seniority system. Under this system an employee gained seniority only in the department to which he was assigned. In some instances, more than one line of progression was available within one seniority unit, but the ability of an employee to obtain a better paying job was limited by the availability of such jobs within the department or seniority unit to which he was assigned. While interdepartmental transfers were permitted on an informal basis, this system created an unequal situation, since all potential transferees under such system would be required to begin at the entry-level job of their new department and would thereby lose accumulated seniority protection against lay-offs. Such impediment bore no relationship to an employee's ability and served only to inhibit transfers between units. Such a system likewise prevented all employees from having an equal opportunity to acquire on-the-job training for better paying jobs, irrespective of ability or aptitude for such jobs.

1965–68 seniority system was not justified by a "business necessity".

■ Although the plaintiffs prayed for back pay as part of their relief, the district court did not directly meet the issue in its opinion. Back pay is clearly an appropriate remedy for Title VII violations.[8] This remedy has been recognized as appropriate by several courts in Title VII class actions.[9] In one of the early cases awarding classwide back pay, Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 720 (7th Cir. 1969), the court expressly considered the proper remedy for persons who had been denied equal opportunities as a consequence of an illegal seniority system:

> The clear purpose of Title VII is to bring an end to the proscribed discriminatory practices and to make whole, in a pecuniary fashion, those who have suffered by it.

In Robinson v. Lorillard Corp., 444 F.2d 791, 802 (4th Cir.) cert. den. 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971), the Fourth Circuit, adopting the analysis in *Bowe* with respect to the nature of back pay awards under Title VII, stated:

> The back pay award is not punitive in nature, but equitable—intended to restore the recipients to their rightful

economic status absent the effects of the unlawful discrimination.

In light of the congressional intent courts should extend

> a wide scope to the act in order to remedy, as much as possible, the plight of persons who have suffered from discrimination in employment opportunities. Rowe v. General Motor Corp., 457 F.2d 348, 354 (5th Cir. 1972).

■ The finding of discrimination by the district court, in addition to the nature of the relief (compensatory as opposed to punitive), and the clear intent of Congress that the grant of authority under Title VII should be broadly read and applied mandate an award of back pay unless exceptional circumstances are present.

■ Congress evidently intended that the award of back pay should rest within the sound discretion of the trial judge. Although appellate courts are loathe to interfere with the exercise of such discretion by a trial court, it is recognized that it is not free from appellate scrutiny. In Moody v. Albemarle Paper Co., 474 F.2d 134, 141 (4th Cir. 1973), the Fourth Circuit said:

> Discretion in a legal sense necessarily is the responsible exercise of of-

---

8. 42 U.S.C. § 2000e–5(g) provides in part: If the court finds that the respondent has intentionally engaged in . . . an unlawful employment practice charged in the complaint, the court may . . . order such affirmative action as may be appropriate, which may include . . . back pay . . . .

Discussing the Congressional intent of the relief section of the 1972 Amendments to Title VII, the Senate-House Conference Report states:

> The provisions of this subsection are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible. In dealing with the present section 706(g) the courts have stressed that the scope of relief under that section of the Act is intended to make the victims of unlawful discrimination whole, and that the attainment of this objective rests not only upon the elimination of the particular unlawful employment practice complained of, but

also requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination." Section-by-Section Analysis, Congressional Record (H.1863), March 8, 1972.

9. *See* Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir.) cert. den. 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971) ; Sprogis v. United Air Lines, Inc., 444 F.2d 1194 (7th Cir. 1971) ; Bowe v. Colgate-Palmolive Co., 416 F.2d 711 (7th Cir. 1969). No case has been found that allowed classwide back pay in a 23(b)(2) class action where final injunctive relief was not deemed appropriate. This issue is not before us at this time. Its relevancy will depend on the district court's determination on remand as to the appropriateness of an injunction. The issue would be whether a 23(b)(2) class can be sustained where injunctive or declaratory relief is not granted.

ficial conscience on all the facts of a particular situation in the light of the *purpose for which the power exists.* Bowles v. Goebel, 151 F.2d 671, 674 (8th Cir. 1945) (emphasis added). Thus in determining the proper scope of the exercise of discretion, the objective sought to be accomplished by the statute must be given great weight. Hecht Co. v. Bowles, 321 U.S. 321, 331, 64 S.Ct. 587, 88 L.Ed. 754 (1944). Where a district court fails to exercise discretion with an eye to the purposes of the Act, it must be reversed. Wirtz v. B. B. Saxon Co., 365 F.2d 457 (5th Cir. 1966); Shultz v. Parke, 413 F.2d 1364 (5th Cir. 1969).

We find no reasonable basis for denial of such relief on the present record. The 1968 change in Timken's seniority system does not ameliorate the injury already suffered. Good faith by Timken either during the 1965–68 period or thereafter is not a valid defense to a claim for back pay.[10] The court in Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972), went to great lengths to emphasize the good faith of the defendant. Nevertheless, the court remanded the case, stating that the district court on reconsideration "will, of course, include the appropriate remedy, back pay, limited or full, etc., as needed to effectuate the Act." Id. at 360.

██ In United States v. I. B. E. W., Local No. 38, 428 F.2d 144, 151 (6th Cir. 1970) (per Edwards, J.) this Court said:

> Assuming, as the District Judge plainly did, and as we do, that the new leadership is in utter good faith, it has no mean task ahead in eliminating

ingrained discriminatory practices of past decades. In many respects a more specific court order, plus retention of jurisdiction, might serve to support the stated objectives of the new administration of Local 38. And, in any event, such relief is authorized by the Act and called for in this record. United States v. Hayes Int'l Corp., 415 F.2d 1038 (5th Cir. 1969).

"Business necessity"[11] is recognized as a defense to an award of back pay under Title VII. In determining whether the 1965–68 seniority system was justified by "business necessity" the district court stated:

> While Timken has convinced the Court generally that it is engaged in a high-technology business and that many of its employees must be highly skilled in Company operations, it has failed to demonstrate that every position at the Company plant is so complex or specialized as to require, without exception, step-by-step job progression within a single department.

This holding seems to refute the defendant's contention that business necessity was a consideration in the district court's failure to award back pay. However, the situation is made more complex by the High Production Plant Program (HPP) used by Timken during the 1965–68 period. The district court found that:

> A reorganization of the Columbus plant beginning in 1965 resulted in the creation of a "High Production Plant Program." Old departments were eliminated, new departments were created and some departments were consolidated. The period of reorganization created job dislocation

---

10. This Court in Manning v. International Union, 466 F.2d 812 (6th Cir. 1972), denied back pay despite a showing of discrimination. That case is easily distinguishable from the case at hand, for in *Manning* the defendants were caught between two statutes, one directing them not to discriminate and one directing them to discriminate.

11. In defining the "business necessity" test in Local 189, United Papermakers and Pap-

erworkers v. United States, 416 F.2d 980 (5th Cir. 1969), the court said:
> When an employer or union has discriminated in the past and when its present policies renew or exaggerate discriminatory effects, *those policies must yield, unless there is an overriding legitimate, non-racial business purpose. Id.* at 989 [Emphasis supplied.]

by transfer and lay-off. Jeopardized employees, i. e., those whose jobs would be eliminated, were granted preference in transfers. During the period July, 1965 to November, 1968 this program displaced 339 employees.

Timken urges this Court to accept two factual assumptions. First, that the HPP played a preeminent part in the district court's denial of relief; and second, that back pay was not awarded because the plaintiffs failed to show that transfers made outside of the HPP were discriminatory.

The district court did hold that the HPP was a "valid business policy and was non-discriminatory in its effect." The plaintiffs have not challenged this holding. They have asserted that the approximately 270 transfers made outside the HPP during the 1965–68 period were discriminatory and were not affected by the business necessity of the HPP. We agree with this conclusion. Timken stresses that every request for a transfer made by a black employee was granted. Even if this is accurate, (as to which the record is unclear) it is irrelevant. The question is not whether Timken prohibited blacks from advancing to better jobs, but whether it discouraged them. The district court found that the unit·or departmental seniority transfer system did inhibit or discourage transfers.[12]

We thus conclude that the district court erred in not awarding back pay to the plaintiffs for the period July 2, 1965 to November 4, 1968. Evidence

as to specific damages may be presented at the hearing upon remand to assess the amounts of back pay for the employees entitled thereto. It should be noted that a back pay award is limited to damages that are actually suffered. Lea v. Cone Mills Corp., 438 F.2d 86 (4th Cir. 1971).

We consider now whether the district court erred in not enjoining Timken's limited bid system. In November, 1968 Timken introduced a new post and bid system based on plant-wide seniority. The plaintiffs have conceded the validity of this system, yet some jobs at Timken are not included in the post and bid system. These jobs are included in another transfer system called the limited bid transfer system.[13] This system has been challenged by the plaintiffs as discriminatory or at least as perpetuating past discrimination.

Before an injunction should be issued in a Title VII case of this nature it should be determined whether the challenged system was discriminatory and, if so, whether it was justified by a business necessity. The district court in this case has held that the limited bid transfer system was not discriminatory, and that even if it was, it was justified by a business necessity.

Clearly, the limited bid system is not discriminatory per se. Here, however, we do not begin with a clean slate since the plaintiffs were subjected to past discrimination. Thus the limited bid system must be examined in light of the residue of past practices.

12. In Bowe v. Colgate-Palmolive, *supra*, the Fourth Circuit, in considering back pay in a situation analogous to the· one before this Court, said:

The court should also ascertain the feasibility of computing the damage to those who, while not laid off, were denied the opportunity to bid on higher paying jobs for which they may have been qualified. 416 F.2d 721 n. 12

13. The district court described the limited bid system in its opinion:

Although most occupations at the plant are now subject to the post and bid sys-

tem on a plant-wide basis, 101 jobs, known as "limited bid" jobs, are not available for general bidding. These generally involve a relatively higher degree of skill and are higher paying than other noncraft positions at the plant and include such jobs as sheet metal worker, fireman, gaugesetter/checker, lineman, head operator, project inspector, refrigeration mechanic, carpenter and stock checker. Each limited bid position has a corresponding "qualifying occupation," and the only employees who may bid for such positions are those who have the requisite qualifications.

Examination of the record before us shows that the limited bid system does indeed perpetuate the effects of prior discrimination. The district court noted obliquely the residual effects of past discrimination when it said:

> Thus, while blacks now occupy 32 percent of all qualifying jobs and 25 percent of all limited bid jobs plant-wide, a substantial proportion of these jobs are in the four predominantly black departments to which they and their class were mostly assigned before 1965.

A system neutral on its face but which in its actual effect perpetuates prior discrimination is prohibited by Title VII. The Supreme Court made this clear in *Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971):

> Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices.

Thus a policy limiting transfers to entry level jobs, *United States v. Hayes*, 456 F.2d 112 (5th Cir. 1972), educational requirements for transfer, *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), a system of departmental seniority, *Papermakers and Paperworkers, Local 189 v. United States*, 416 F.2d 980 (5th Cir. 1969), cert. den. 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970), and a no transfer rule, *Jones v. Lee Way Motor Freight*, 431 F. 2d 245 (10th Cir. 1970), cert. den. 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971), have been enjoined, not because they were facially discriminatory, but because they perpetuated originally segregated departmental or job assignments. Timken's limited bid system has the same effect and must be enjoined unless it is justified by a business necessity.

The district court held in the alternative that even if the post-1968 system was discriminatory in effect, it was jus-tified by the business necessity test. We are not prepared to say that this conclusion is erroneous, but an examination of the court's analysis reveals at least that the test was not properly applied.

The court placed the burden of proving the absence of business necessity on the plaintiffs. This, in our opinion, was error. If an employment practice, though facially neutral, is shown to have a differential impact on minority employment, it is prohibited unless the employer can prove business necessity. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Moody v. Albemarle Paper Co.*, 474 F.2d 134 (4th Cir. 1973).

The court's error arose from its failure to take into account one necessary element of the test. The test consists of two discrete parts as set forth in *Robinson v. Lorillard Co.*, 444 F.2d at 798:

> The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact.

The first prong of the test was correctly applied by the court below but there was no finding or holding that the limited bid system could not be replaced by another plan that would be just as efficacious for Timken's business purpose with a lesser racial impact. This must be considered on remand.

As stated, the district court found discrimination but awarded no relief. Since we remand the case for further consideration of the issues indicated herein, we deem it inappropriate to con-

880

sider at this juncture the district court's denial of attorney's fees. A successful plaintiff stands in a different light from an unsuccessful one on this question. Lea v. Cone Mills Corp., 438 F.2d 86 (4th Cir. 1971). On remand, the district court will reconsider the matter of attorney's fees in light of our rulings herein and other relevant factors.

The district court's judgment is affirmed in part, reversed in part, and the case is remanded for further proceedings not inconsistent with this opinion.[14] Plaintiffs-Appellants will recover from Defendants-Appellees the costs on appeal.

14. We observe that the district judge in a pretrial order mentioned the possibility of referring the case to a special master in the event that damages should be allowable. We have not discussed this question since no damages were allowed by the district court and the issue is not before us. On remand, it will be necessary for the district judge on the facts of the present case to determine his authority in this respect.